## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| UNITED STATES OF AMERICA<br>Department of Justice, Antitrust Division<br>1401 H Street, N.W., Suite 8000<br>Washington, DC 20530,<br><br>　　　　　Plaintiff,<br><br>　　　v.<br><br>ALLTEL CORPORATION<br>One Allied Drive<br>Little Rock, Arkansas  72202<br><br>and<br><br>WESTERN WIRELESS CORPORATION<br>3650 13lst Avenue SE, Suite 400<br>Bellevue, Washington 98006,<br><br><br>　　　　　Defendants. | )<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)　Civil No.:<br>)<br>)<br>)<br>)　Filed:<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>) |

## COMPLAINT

The United States of America, acting under the direction of the Attorney General of the United States, brings this civil action to enjoin the merger of two mobile wireless telecommunications service providers, ALLTEL Corporation ("ALLTEL") and Western Wireless Corporation ("Western Wireless"), and to obtain other relief as appropriate.  Plaintiff alleges as follows:

1.　　　　　On January 9, 2005, ALLTEL entered into an agreement to acquire Western Wireless under which the two companies would combine their mobile wireless telecommunications services businesses.  Plaintiff seeks to enjoin this transaction because it will

substantially lessen competition for mobile wireless telecommunications services in several

geographic markets where ALLTEL and Western Wireless are each other's most significant

competitor.

2.        ALLTEL provides mobile wireless telecommunications services in twenty-four

(24) states serving approximately 8.8 million subscribers.  Western Wireless provides mobile

wireless telecommunications services in nineteen (19) states under the Cellular One service mark

and in one (1) license area in Texas under the Western Wireless service mark; it has

approximately 1.4 million subscribers.  The combination of ALLTEL and Western Wireless will

substantially lessen competition for mobile wireless telecommunications services in sixteen (16)

geographic areas in three (3) states, Arkansas, Kansas and Nebraska, where currently both

ALLTEL and Western Wireless operate.  As a result of the proposed acquisition, residents of

these mostly rural areas will face the likelihood of increased prices, diminished quality or

quantity of services provided, and less investment in network improvements for these services.


## I. JURISDICTION AND VENUE

3.        This Complaint is filed by the United States under Section 15 of the Clayton Act,

15 U.S.C. § 25, to prevent and restrain defendants from violating Section 7 of the Clayton Act,

15 U.S.C. § 18.

4.        ALLTEL and Western Wireless are engaged in interstate commerce and in

 activities substantially affecting interstate commerce.  The Court has jurisdiction over this action

pursuant to Sections 15 and 16 of the Clayton Act, 15 U.S.C. §§ 25, 26, and 28 U.S.C. §§ 1331,

1337.

2

5.    The defendants have consented to personal jurisdiction and venue in this judicial

district.

## II. THE DEFENDANTS AND THE TRANSACTION

6.    ALLTEL, with headquarters in Little Rock, Arkansas, is a corporation organized

and existing under the laws of the state of Delaware.  ALLTEL is the sixth largest provider of

mobile wireless voice and data services in the United States by number of subscribers; it serves

approximately 8.8 million customers.  It provides mobile wireless telecommunications services

in one hundred fifty-one (151) rural service areas and in ninety-two (92) metropolitan statistical

areas located within twenty-four (24) states and roaming services to other mobile wireless

providers who use the CDMA platform in these areas.  ALLTEL provides local wireline

telephone service to 3 million customers primarily located in rural areas in fifteen (15) states.  In

2004, ALLTEL earned revenues of approximately $8.2 billion.

7.    Western Wireless, with headquarters in Bellevue, Washington, is a corporation

 organized and existing under the laws of the state of Washington.  Western Wireless is the ninth

largest provider of mobile wireless voice and data services in the United States by number of

subscribers; it serves approximately 1.4 million customers.  It operates in eighty-eight (88) rural

service areas and nineteen (19) metropolitan statistical areas located within nineteen (19) western

states.  Western Wireless also provides in its service areas roaming services to other providers

who use CDMA, TDMA and GSM technology.  Through its subsidiary, Western Wireless

International, it provides communications services in seven (7) countries outside of the United

States.  Western Wireless owns the Cellular One Group, a general partnership that owns the

3

Cellular One service mark and licenses use of the mark to other mobile wireless providers. In 2004, Western earned approximately $1.9 billion in revenues.

8.        Pursuant to an Agreement and Plan of Merger dated January 9, 2005, ALLTEL will acquire Western Wireless in a stock-and-cash transaction valued at approximately $6 billion. If this transaction is consummated, ALLTEL and Western Wireless combined would have approximately 10 million subscribers in the United States, with $10.1 billion in revenues and operations in thirty-three (33) states.

## III. TRADE AND COMMERCE

### A. Nature of Trade and Commerce

9.        Mobile wireless telecommunications services allow customers to make and receive telephone calls and use data services using radio transmissions without being confined to a small area during the call or data session, and without the need for unobstructed line-of-sight to the radio tower. Mobility is highly prized by customers, as demonstrated by the more than 180 million people in the United States who own mobile wireless telephones. In 2004, revenues from the sale of mobile wireless services in the United States were over $100 billion. To meet this desire for mobility, mobile wireless telecommunications providers must deploy an extensive network of switches and radio transmitters and receivers, and interconnect this network with the networks of wireline carriers and with other wireless providers.

10.        The first wireless voice systems were based on analog technology, now referred to as first-generation or "1G" technology. These analog systems were launched after the FCC issued the first licenses for mobile wireless telephone service: two cellular licenses (A-block and

4

B-block) in each geographic area in the early to mid-1980s. The licenses are in the 800 MHz range of the radio spectrum, each license consists of 25 MHz of spectrum, and they are issued for each Metropolitan Statistical Area ("MSA") and Rural Service Area ("RSA") (collectively, "Cellular Marketing Areas" or "CMAs"), with a total of 734 CMAs covering the entire United States. In 1982, one of the licenses was issued to the incumbent local exchange carrier in the market, and the other was issued by lottery to someone other than the incumbent. In the relevant geographic markets, ALLTEL and Western Wireless each own one of the cellular licenses.

11.      In 1995, the FCC allocated and subsequently issued licenses for additional spectrum for the provision of Personal Communications Services ("PCS"), a category of services that includes mobile wireless telecommunications services comparable to those offered by cellular licensees. These licenses are in the 1.8 GHz range of the radio spectrum and are divided into six blocks: A, B, and C, which consist of 30 MHz each; and D, E, and F, which consist of 10 MHz each. Geographically, the A and B-block 30 MHz licenses are issued by Major Trading Areas ("MTAs"), and C, D, E, and F-block licenses are issued by Basic Trading Areas ("BTAs"), several of which comprise each MTA. MTAs and BTAs do not generally correspond to MSAs and RSAs. With the introduction of the PCS licenses, both cellular and PCS licensees began offering digital services, thereby increasing capacity, shrinking handsets, and extending battery life. In 1996, one provider, a specialized mobile radio ("SMR" or "dispatch") spectrum licensee, began to use its SMR spectrum to offer mobile wireless telecommunications services comparable to those offered by other mobile wireless telecommunications services providers, in conjunction with its dispatch, or "push-to-talk," service. Although there are a number of providers holding spectrum licenses in each area of the country, not all providers have fully built out their networks

5

throughout each license area.  In particular, because of the characteristics of PCS spectrum,

providers holding this type of spectrum have found it less attractive to build out in rural areas.

12.    Today, more than 90 percent of all mobile wireless telecommunications services

customers have digital service, and nearly all mobile wireless voice service has migrated to

second-generation or "2G" digital technologies:  TDMA (time division multiple access), GSM

(global standard for mobile, a type of TDMA standard used by all carriers in Europe), and

CDMA (code division multiple access).  Mobile wireless telecommunications services providers

have chosen to build their networks on these incompatible technologies and most have chosen

CDMA or GSM, with TDMA having been orphaned by equipment vendors.  (The SMR

providers use a fourth incompatible technological standard better suited to the spectrum they

own, and, as SMR licensees, they have no obligation to support a specific technology standard.)

Even more advanced technologies ("2.5G" and "3G") have begun to be deployed for voice and

data.

**B.    Relevant Product Market**

13.    Mobile wireless telecommunications services is a relevant product market.

Mobile wireless telecommunications services include both voice and data services provided over

a radio network and allows customers to maintain their telephone calls or data sessions without

wires, such as when traveling.  There are no cost-effective alternatives to mobile wireless

telecommunications services.  Fixed wireless services are not mobile, and other wireless services

have a limited range (e.g., Wi-Fi); neither offers a viable alternative to mobile wireless

telecommunications service.  It is unlikely that a sufficient number of customers would switch

away from mobile wireless telecommunications services to make a small but significant price

6

increase in those services unprofitable. Mobile wireless telecommunications services is a relevant product market under Section 7 of the Clayton Act, 15 U.S.C. § 18.

### C.     Relevant Geographic Markets

14.     The large majority of customers use mobile wireless telecommunications services in close proximity to their workplaces and homes. Thus, customers purchasing mobile wireless telecommunications services choose among mobile wireless telecommunications services providers that offer services where they are located and travel on a regular basis: home, work, other areas they commonly visit, and areas in between. The number and identity of mobile wireless telecommunications services providers varies among geographic areas, along with the quality of their services and the breadth of their geographic coverage, all of which are significant factors in customers' purchasing decisions. Mobile wireless telecommunications services providers can and do offer different promotions, discounts, calling plans, and equipment subsidies in different geographic areas, effectively varying the price for customers by geographic area.

15.     The United States comprises numerous local geographic markets for mobile wireless telecommunications services. The FCC has licensed a limited number of mobile wireless telecommunications services providers in each local area based upon the availability of radio spectrum. These FCC spectrum licensing areas often represent the core of the business and social sphere where customers face the same competitive choices for mobile wireless telecommunications services. The relevant geographic markets in which this transaction will substantially lessen competition in mobile wireless telecommunications services are effectively represented, but not defined, by FCC spectrum licensing areas.

7

16.      The relevant geographic markets, under Section 7 of the Clayton Act, 15 U.S.C.

§ 18, where the transaction will substantially lessen competition for mobile wireless

telecommunications services are represented by the following FCC spectrum licensing areas

which are all Rural Service Areas:  Arkansas RSA-11 (CMA 334), Kansas RSA-3 (CMA 430),

Kansas RSA-4 (CMA 431), Kansas RSA-8 (CMA 435), Kansas RSA-9 (CMA 436), Kansas

RSA-10 (CMA 437), Kansas RSA-14 (CMA 441), Nebraska RSA-2 (CMA 534), Nebraska-RSA

3 (CMA 535), Nebraska RSA-4 (CMA 536), Nebraska RSA-5 (CMA 537), Nebraska RSA-6

(CMA 538), Nebraska RSA-7 (CMA 539), Nebraska RSA-8 (CMA 540), Nebraska RSA-9

(CMA 541), and Nebraska RSA-10 (CMA 542).  It is unlikely that a sufficient number of

customers would switch to mobile wireless telecommunications services providers in a different

geographic market to make a small but significant price increase in the relevant geographic

markets unprofitable for mobile wireless telecommunications services.

### D.      Anticompetitive Effects

#### 1.      Mobile Wireless Telecommunications Services

17.      The companies' combined market shares for mobile wireless telecommunications

services in the relevant markets described above, as measured in terms of subscribers, range from

over 50 to nearly 100 percent.  In each relevant geographic market, ALLTEL has the largest

market share and, in all but four (4) RSAs, Western Wireless is the second-largest mobile

wireless telecommunications services provider.  In all of the relevant geographic markets,

ALLTEL and Western Wireless own the only 800 MHz band cellular spectrum licenses, which

are more efficient in serving rural areas than 1900 MHz band PCS spectrum.  As a result of

holding the cellular spectrum licenses and being early entrants into these markets, ALLTEL's and

8

Western Wireless' networks provide greater depth and breadth of coverage than their competitors, which are operating on PCS spectrum in the relevant geographic markets, and thus are more attractive to consumers.

In addition, mobile wireless telecommunications services providers with partial coverage in a geographic area do not aggressively market their services in these markets because potential customers would use their wireless telephones primarily in areas where these providers have no network. In theory, these less-built-out providers could serve residents of the rural areas through roaming agreements, but as a practical matter when service is provided on another carrier's network, the providers have to pay roaming charges to, and rely on, that provider to maintain the quality of the network. Because of these constraints, carriers with limited network coverage in an area are reluctant to market their services to residents of that area. Therefore, ALLTEL and Western Wireless are likely closer substitutes for each other than the other mobile wireless services providers who own only PCS spectrum in the relevant geographic markets.

18.    The relevant geographic markets for mobile wireless services are highly concentrated. As measured by the Herfindahl-Hirschman Index ("HHI"), which is commonly employed in merger analysis and is defined and explained in Appendix A to this Complaint, concentration in these markets ranges from over 2100 to more than 8500, which is well above the 1800 threshold at which the Department considers a market to be highly concentrated. After ALLTEL's proposed acquisition of Western Wireless is consummated, the HHIs in the relevant geographic markets will range from over 3400 to almost 9700, with increases in the HHI as a result of the merger ranging from over 1100 to over 4600, significantly beyond the thresholds at which the Department considers a transaction likely to cause competitive harm.

19.        Competition between ALLTEL and Western Wireless in the relevant geographic markets has resulted in lower prices and higher quality in mobile wireless telecommunications services, than would otherwise have existed in these geographic markets.  In these areas, consumers consider ALLTEL and Western Wireless to be the most attractive competitors because other providers' networks lack coverage or provide lower quality service.  If ALLTEL's proposed acquisition of Western Wireless is consummated, the relevant geographic markets for mobile wireless telecommunications services will become substantially more concentrated, and the competition between ALLTEL and Western Wireless in mobile wireless telecommunications services will be eliminated in these markets.  As a result, the loss of competition between ALLTEL and Western Wireless increases the likelihood of unilateral actions by the merged firm in the relevant geographic markets to increase prices, diminish the quality or quantity of services provided, and refrain from or delay making investments in network improvements.  Therefore, ALLTEL's proposed acquisition of Western Wireless will likely result in substantially less competition in mobile wireless telecommunications services in the relevant geographic markets.

### 2.        Entry

20.        Entry by a new mobile wireless telecommunications services provider in the relevant geographic markets would be difficult, time-consuming, and expensive, requiring the acquisition of spectrum licenses and the build-out of a network.  Expansion by providers who hold spectrum in these areas is also unlikely as the relevant geographic markets are rural service areas where the combined firm would own all of the available 800 MHz cellular spectrum.  Due to propagation characteristics of 800 MHz cellular spectrum and 1900 MHz PCS spectrum, the 800 MHz signals can cover a substantially broader area than the 1900 MHz signals.  The

estimated coverage advantage of the 800 MHz cellular spectrum in rural areas ranges from two to as much as five times greater than PCS. In rural markets, this difference results in higher build-out costs for PCS networks than for cellular networks. The high costs of constructing PCS networks in rural markets combined with the relatively low population density makes it less likely that carriers that own PCS spectrum would build out in the relevant geographic markets. Therefore, new entry in response to a small but significant price increase for mobile wireless services by the merged firm in the relevant geographic markets would not be timely, likely, or sufficient to thwart the competitive harm resulting from ALLTEL's proposed acquisition of Western Wireless, if it were to be consummated.

## IV. VIOLATION ALLEGED

21.    The effect of ALLTEL's proposed acquisition of Western Wireless, if it were to be consummated, may be substantially to lessen competition in interstate trade and commerce in the relevant geographic markets for mobile wireless telecommunications services, in violation of Section 7 of the Clayton Act, 15 U.S.C. § 18.

22.    Unless restrained, the transaction will likely have the following effects in mobile wireless telecommunications services in the relevant geographic markets, among others:

    a.    actual and potential competition between ALLTEL and Western Wireless will be eliminated;

    b.    competition in general will be lessened substantially;

    c.    prices are likely to increase;

    d.    the quality and quantity of services are likely to decrease; and

11

e.    incentives to improve wireless networks will be reduced.

## V. REQUESTED RELIEF

23.    That ALLTEL's proposed acquisition of Western Wireless be adjudged to violate Section 7 of the Clayton Act, 15 U.S.C. § 18;

24.    That defendants be permanently enjoined from and restrained from carrying out the Agreement and Plan of Merger, dated January 9, 2005, or from entering into or carrying out any agreement, understanding, or plan, the effect of which would be to bring the wireless services businesses of ALLTEL and Western Wireless under common ownership or control;

25.    That plaintiffs be awarded their costs of this action; and

26.     That plaintiffs have such other relief as the Court may deem just and proper.

Dated: July 6, 2005

Respectfully Submitted,

FOR PLAINTIFF UNITED STATES OF AMERICA:

_____
Thomas O. Barnett
Acting Assistant Attorney General
Antitrust Division

_____
J. Bruce McDonald
Deputy Assistant Attorney General
Antitrust Division

_____
J. Robert Kramer II
Director of Operations
Antitrust Division

_____
Nancy Goodman (D.C. # 251694)
Chief, Telecommunications & Media
Enforcement Section
Antitrust Division

_____
Laury Bobbish
Assistant Chief, Telecommunications &
Media Enforcement Section
Antitrust Division

_____
Deborah A. Roy (D.C. Bar # 452573)
Laura R. Starling
Hillary B. Burchuk (D.C. Bar # 366755)
Matthew C. Hammond

Attorneys, Telecommunications & Media
Enforcement Section
Antitrust Division

U.S. Department of Justice
City Center Building
1401 H Street, N.W., Suite 8000
Washington, D.C. 20530
(202) 514-5621
Facsimile: (202) 514-6381

13

## APPENDIX A

### Herfindahl-Hirschman Index

"HHI" means the Herfindahl-Hirschman Index, a commonly accepted measure of market concentration.  It is calculated by squaring the market share of each firm competing in the market and then summing the resulting numbers.  For example, for a market consisting of four firms with shares of 30, 30, 20, and 20 percent, the HHI is 2600 ($30^2 + 30^2 + 20^2 + 20^2 = 2600$).  (Note: Throughout the Complaint, market share percentages have been rounded to the nearest whole number, but HHIs have been estimated using unrounded percentages in order to accurately reflect the concentration of the various markets.)  The HHI takes into account the relative size distribution of the firms in a market and approaches zero when a market consists of a large number of small firms.  The HHI increases both as the number of firms in the market decreases and as the disparity in size between those firms increases.

Markets in which the HHI is between 1000 and 1800 points are considered to be moderately concentrated, and those in which the HHI is in excess of 1800 points are considered to be highly concentrated.  *See Horizontal Merger Guidelines* ¶ 1.51 (revised Apr. 8, 1997). Transactions that increase the HHI by more than 100 points in concentrated markets presumptively raise antitrust concerns under the guidelines issued by the U.S. Department of Justice and Federal Trade Commission.  *See id.*