**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| UNITED STATES OF AMERICA, | ) |
| | ) |
| *Plaintiff,* | )  Civil No. |
| | ) |
| v. | ) |
| | )  Filed: |
| ALLTEL CORPORATION and | ) |
| WESTERN WIRELESS CORPORATION, | ) |
| | ) |
| *Defendants.* | ) |
| | ) |

## COMPETITIVE IMPACT STATEMENT

Plaintiff United States of America ("United States"), pursuant to Section 2(b) of the

Antitrust Procedures and Penalties Act ("APPA" or "Tunney Act"), 15 U.S.C. § 16(b)-(h), files

this Competitive Impact Statement relating to the proposed Final Judgment submitted for entry in

this civil antitrust proceeding.

## I. Nature and Purpose of the Proceeding

Defendants entered into an Agreement and Plan of Merger dated January 9, 2005,

pursuant to which ALLTEL Corporation ("ALLTEL") will acquire Western Wireless

Corporation ("Western"). Plaintiff filed a civil antitrust Complaint on July 6, 2005 seeking to

enjoin the proposed acquisition. The Complaint alleges that the likely effect of this acquisition

would be to lessen competition substantially for mobile wireless telecommunications services in

sixteen (16) geographic areas in the states of Arkansas, Kansas, and Nebraska in violation of

Section 7 of the Clayton Act, 15 U.S.C. § 18. This loss of competition would result in

consumers facing higher prices and lower quality or quantity of mobile wireless telecommunications services.

At the same time the Complaint was filed, plaintiff also filed a Preservation of Assets Stipulation and Order and proposed Final Judgment, which are designed to eliminate the anticompetitive effects of the acquisition. Under the proposed Final Judgment, which is explained more fully below, defendants are required to divest Western Wireless' mobile wireless telecommunications services businesses and related assets in sixteen (16) markets ("Wireless Business Divestiture Assets") and Western Wireless' Cellular One Group Assets which includes the Cellular One service mark and related assets ("Cellular One Group Assets") (collectively the "Divestiture Assets"). Under the terms of the Preservation of Assets Stipulation and Order, defendants will take certain steps to ensure (a) that these assets are preserved and that the Divestiture Assets are operated as competitively independent, economically viable and ongoing businesses; (b) that they will remain independent and uninfluenced by defendants or the consummation of the transaction; and (c) that competition is maintained during the pendency of the ordered divestiture.

Plaintiff and defendants have stipulated that the proposed Final Judgment may be entered after compliance with the APPA. Entry of the proposed Final Judgment would terminate this action, except that the Court would retain jurisdiction to construe, modify, or enforce the provisions of the proposed Final Judgment and to punish violations thereof. Defendants have also stipulated that they will comply with the terms of the Preservation of Assets Stipulation and Order and the proposed Final Judgment from the date of signing of the Preservation of Assets Stipulation and Order, pending entry of the proposed Final Judgment by the Court and the

2

required divestitures. Should the Court decline to enter the proposed Final Judgment, defendants have also committed to continue to abide by its requirements and those of the Preservation of Assets Stipulation and Order until the expiration of time for appeal.

## II. Description of the Events Giving Rise to the Alleged Violation

### A. The Defendants and the Proposed Transaction

ALLTEL, with headquarters in Little Rock, Arkansas, is a corporation organized and existing under the laws of the state of Delaware. ALLTEL is the sixth-largest provider of mobile wireless voice and data services in the United States by number of subscribers; it serves approximately 8.8 million customers. It provides mobile wireless telecommunications services in one hundred fifty-one (151) rural service areas and in ninety-two (92) metropolitan statistical areas located within twenty-four (24) states and roaming services in these areas to other mobile wireless providers who use the CDMA platform. ALLTEL provides local wireline telephone service to 3 million customers primarily located in rural areas in fifteen (15) states. In 2004, ALLTEL earned revenues of approximately $8.2 billion.

Western Wireless, with headquarters in Bellevue, Washington, is a corporation organized and existing under the laws of the state of Washington. Western is the ninth-largest provider of mobile wireless voice and data services in the United States by number of subscribers; it serves approximately 1.4 million customers. It operates in eighty-eight (88) rural service areas and nineteen (19) metropolitan statistical areas located within nineteen (19) western states under the Cellular One service mark, except in one (1) license area in Texas where it operates as Western Wireless. Western Wireless also provides in its service areas roaming services to other providers who use CDMA, TDMA, and GSM technology. Through its subsidiary, Western Wireless

3

International, it provides communications services in seven (7) countries outside of the United States. Western Wireless owns the Cellular One Group, a general partnership that owns the Cellular One service mark and licenses use of the mark to other mobile wireless providers. In 2004, Western Wireless earned approximately $1.9 billion in revenues.

Pursuant to an Agreement and Plan of Merger dated January 9, 2005, ALLTEL will acquire Western Wireless in a stock-and-cash transaction valued at approximately $6 billion. If this transaction is consummated, ALLTEL and Western Wireless combined would have approximately 10 million subscribers, with $10.1 billion in revenues and operations in thirty-three (33) states.

The proposed transaction, as initially agreed to by defendants, would lessen competition substantially for mobile wireless telecommunications services in sixteen (16) markets. This acquisition is the subject of the Complaint and proposed Final Judgment filed by plaintiffs.

**B. Mobile Wireless Telecommunications Services Industry**

Mobile wireless telecommunications services allow customers to make and receive telephone calls and use data services using radio transmissions without being confined to a small area during the call or data session, and without the need for unobstructed line-of-sight to the radio tower. This mobility is highly prized by customers, as demonstrated by the more than 180 million people in the United States who own mobile wireless telephones. In 2004, revenues for the sale of mobile wireless telecommunications services in the United States were over $100 billion. To provide these services, mobile wireless telecommunications services providers must acquire adequate and appropriate spectrum, deploy an extensive network of switches, radio transmitters, and receivers, and interconnect this network with those of local and long-distance

4

wireline telecommunications providers and other mobile wireless telecommunications services providers.

The first wireless voice systems were based on analog technology, now referred to as first-generation or "1G" technology. These analog systems were launched after the FCC issued the first licenses for mobile wireless telephone service: two cellular licenses (A-block and B-block) in each geographic area in the early to mid-1980s. The licenses are in the 800 MHz range of the radio spectrum, each license consists of 25 MHz of spectrum, and they are issued for each Metropolitan Statistical Area ("MSA") and Rural Service Area ("RSA") (collectively, "Cellular Marketing Areas" or "CMAs"), with a total of 734 CMAs covering the entire United States. In 1982, one of the licenses was issued to the incumbent local exchange carrier in the market, and the other was issued by lottery to someone other than the incumbent. Cellular licenses must support analog service until February 2008.

In 1995, the FCC allocated and subsequently issued licenses for additional spectrum for the provision of Personal Communications Services ("PCS"), a category of services that includes mobile wireless telecommunications services comparable to those offered by cellular licensees. These licenses are in the 1.8 GHz range of the radio spectrum and are divided into six blocks: A, B, and C, which consist of 30 MHz each; and D, E, and F, which consist of 10 MHz each. Geographically, the A and B-block 30 MHz licenses are issued by Major Trading Areas ("MTAs"), and C, D, E, and F-block licenses are issued by Basic Trading Areas ("BTAs"), several of which comprise each MTA. MTAs and BTAs do not generally correspond to MSAs and RSAs. With the introduction of the PCS licenses, both cellular and PCS licensees began offering digital services, thereby increasing capacity, shrinking handsets, and extending battery

5

life.  In 1996, one provider, a specialized mobile radio ("SMR" or "dispatch") spectrum licensee,

began to use its SMR spectrum to offer mobile wireless telecommunications services comparable

to those offered by other mobile wireless telecommunications services providers, in conjunction

with its dispatch, or "push-to-talk," service.

Today, more than 90 percent of all mobile wireless telecommunications services

customers have digital service, and nearly all mobile wireless voice service has migrated to

second-generation or "2G" digital technologies: TDMA (time division multiple access), GSM

(global standard for mobile, a type of TDMA standard used by all carriers in Europe), and

CDMA (code division multiple access).  Mobile wireless telecommunications services providers

have chosen to build their networks on these incompatible technologies and most have chosen

CDMA or GSM, with TDMA having been orphaned by equipment vendors.  (The SMR

providers use a fourth incompatible technological standard better suited to the spectrum they

own, and, as SMR licensees, they have no obligation to support a specific technology standard.)

Even more advanced technologies ("3G") have begun to be deployed for voice and data.  In all of

the geographic areas alleged in the complaint, ALLTEL and Western Wireless own the 25 MHz

cellular licenses.  Western also owns some additional PCS licenses.  Cellular spectrum because

of its propagation characteristics is more efficient to use in serving rural areas.

### C. The Competitive Effects of the Transaction on Mobile Wireless Telecommunications Services

ALLTEL's proposed acquisition of Western Wireless will substantially lessen

competition in mobile wireless telecommunications services in the sixteen (16) relevant

geographic areas.  Mobile wireless telecommunications services include both voice and data

services provided over a radio network and allow customers to maintain their telephone calls or data sessions without wires, such as when traveling. Fixed wireless services and other wireless services that have a limited range (e.g., Wi-Fi) do not offer a viable alternative to mobile wireless telecommunications services primarily because customers using these services cannot maintain a call or data session while moving from one location to another.

Most customers use mobile wireless telecommunications services in close proximity to their workplaces and homes. Thus, customers purchasing mobile wireless telecommunications services choose among mobile wireless telecommunications services providers that offer services where they are located and travel on a regular basis: home, work, other areas they commonly visit, and areas in between. The number and identity of mobile wireless telecommunications services providers varies from geographic area to geographic area, along with the quality of their services and the breadth of their geographic coverage, all of which are significant factors in customers' purchasing decisions. Mobile wireless telecommunications services providers can and do offer different promotions, discounts, calling plans, and equipment subsidies in different geographic areas, effectively varying the actual price for customers by geographic area.

The relevant geographic markets for mobile wireless telecommunications services are, therefore, local in nature. The FCC has licensed a limited number of mobile wireless telecommunications services providers in these and other geographic areas based upon the availability of radio spectrum. These FCC spectrum licensing areas often represent the core of the business and social sphere where customers face the same competitive choices for mobile wireless telecommunications services. Although not all FCC spectrum licensing areas are relevant geographic areas for the purpose of analyzing the antitrust impact of this transaction, the

7

FCC spectrum licensing areas that encompass the sixteen (16) geographic areas of concern in this transaction are where consumers in these communities principally use their mobile wireless telecommunications services. As described in the Complaint, the relevant geographic markets where the transaction will substantially lessen competition for mobile wireless telecommunications services are represented by the following FCC spectrum licensing areas which are all Rural Service Areas ("RSAs"): Arkansas RSA-11 (CMA 334), Kansas RSA-3 (CMA 430), Kansas RSA-4 (CMA 431), Kansas RSA-8 (CMA 435), Kansas RSA-9 (CMA 436), Kansas RSA-10 (CMA 437), Kansas RSA-14 (CMA 441), Nebraska RSA-2 (CMA 534), Nebraska RSA-3 (CMA 535), Nebraska RSA-4 (CMA 536), Nebraska RSA-5 (CMA 537), Nebraska RSA-6 (CMA 538), Nebraska RSA-7 (CMA 539), Nebraska RSA-8 (CMA 540), Nebraska RSA-9 (CMA 541), and Nebraska RSA-10 (CMA 542).

The sixteen (16) geographic markets of concern for mobile wireless telecommunications services were identified by a fact-specific, market-by-market analysis that included consideration of, but was not limited to, the following factors: the number of mobile wireless telecommunications services providers and their competitive strengths and weaknesses; ALLTEL's and Western Wireless' market shares along with those of the other providers; whether additional spectrum is or is likely soon to be available; whether any providers are limited by insufficient spectrum or other factors in their ability to add new customers; the concentration of the market, and the breadth and depth of coverage by different providers in each market; and the likelihood that any provider would expand its existing coverage.

ALLTEL and Western Wireless both own businesses that offer mobile wireless telecommunications services in the sixteen (16) relevant geographic areas. The companies'

8

combined market shares for mobile wireless telecommunications services in the relevant markets as measured in terms of subscribers range from over 50 to nearly 100 percent. In each relevant geographic market, ALLTEL has the largest market share, and, in all but four RSAs, Western Wireless is the second-largest mobile wireless telecommunications services provider. In all of the relevant geographic markets, ALLTEL and Western Wireless own the only 800 MHz band cellular spectrum licenses which are more efficient in serving rural areas than 1900 MHz band PCS spectrum. As a result of holding the cellular spectrum licenses and being early entrants into these markets, ALLTEL's and Western Wireless' networks provide greater depth and breadth of coverage than their competitors, which are operating on PCS spectrum in the relevant geographic markets, and thus are more attractive to consumers.

In addition, mobile wireless telecommunications services providers with partial coverage in a geographic area do not aggressively market their services in this location because potential customers would use their wireless telephones primarily in places where these providers have no network. In theory, these less built-out providers could service residents of these rural areas through roaming agreements, but as a practical matter when service is provided on another carrier's network, the providers would have to pay roaming charges to, and rely on, that carrier to maintain the quality of the network. Because of these constraints, the other providers who own partially built-out networks in the sixteen (16) geographic areas are reluctant to market their services to rural residents of these areas. Therefore, ALLTEL and Western Wireless are likely closer substitutes for each other than the other mobile wireless telecommunications services providers in the relevant geographic markets. Additionally, post-merger in these markets, there will be insufficient remaining competitors, with the type of coverage desired by customers, and

9

the ability to compete effectively to defeat a small, but significant price increase by the merged

firm.

    The relevant geographic markets for mobile wireless telecommunications services are

highly concentrated. As measured by the Herfindahl-Hirschman Index ("HHI"), which is

commonly employed in merger analysis and is defined and explained in Appendix A to the

Complaint, concentration in these markets ranges from over 2100 to more than 8500, which is

well above the 1800 threshold at which the Department considers a market to be highly

concentrated. After ALLTEL's proposed acquisition of Western Wireless is consummated, the

HHIs in the relevant geographic markets will range from over 3400 to almost 9700, with increases

in the HHI as a result of the merger ranging from over 1100 to over 4600.

    Competition between ALLTEL and Western Wireless in the relevant geographic markets

has resulted in lower prices and higher quality in mobile wireless telecommunications services

than would otherwise have existed in these geographic markets. If ALLTEL's proposed

acquisition of Western Wireless is consummated, the competition between ALLTEL and Western

Wireless in mobile wireless telecommunications services will be eliminated in these markets and

the relevant geographic markets for mobile wireless telecommunications services will become

substantially more concentrated. As a result, the loss of competition between ALLTEL and

Western Wireless increases the likelihood of unilateral actions by the merged firm in the relevant

geographic markets to increase prices, diminish the quality or quantity of services provided, and

refrain from or delay making investments in network improvements.

    Entry by a new mobile wireless telecommunications services provider in the relevant

geographic markets would be difficult, time-consuming, and expensive, requiring the acquisition

of spectrum licenses and the build-out of a network. Expansion by providers who hold spectrum in these areas and are only partially built-out is also unlikely as the relevant geographic markets are rural service areas where the combined firm would own all of the available 800 MHz spectrum. Due to propagation characteristics of 800 MHz cellular spectrum and 1900 MHz PCS spectrum, the 800 MHz signals can cover a substantially broader area than the 1900 MHz signals. The estimated coverage advantage of the 800 MHz spectrum in rural areas ranges from two to as much as five times greater than PCS. In rural markets, this difference results in higher build-out costs for PCS networks than for cellular networks. The high costs of constructing PCS networks in rural markets combined with the relatively low population density makes it less likely that carriers that own PCS spectrum would build out in the relevant geographic markets. Therefore, new entry in response to a small but significant price increase for mobile wireless telecommunications services by the merged firm in the relevant geographic markets would not be timely, likely, or sufficient to thwart the competitive harm that would result from ALLTEL's proposed acquisition of Western Wireless.

For these reasons, plaintiff concluded that ALLTEL's proposed acquisition of Western Wireless will likely substantially lessen competition, in violation of Section 7 of the Clayton Act, in the provision of mobile wireless telecommunications services in the relevant geographic markets.

### III. Explanation of the Proposed Final Judgment

The divestiture requirements of the proposed Final Judgment will eliminate the anticompetitive effects of the acquisition in mobile wireless telecommunications services in the sixteen (16) geographic markets of concern. The proposed Final Judgment requires defendants,

11

within one hundred twenty (120) days after the filing of the Complaint, or five (5) days after notice of the entry of the Final Judgment by the Court, whichever is later, to divest the Wireless Business Divestiture Assets and the Cellular One Group Assets. The Wireless Business Divestiture Assets are essentially Western's entire mobile wireless telecommunications services business in the sixteen (16) markets where ALLTEL and Western Wireless are each other's closest competitors for mobile wireless telecommunications services. These assets must be divested in such a way as to satisfy plaintiff in its sole discretion that they will be operated by the purchaser as a viable, ongoing business that can compete effectively in the relevant market. Defendants must take all reasonable steps necessary to accomplish the divestitures quickly and shall cooperate with prospective purchasers.

With respect to the Wireless Business Divestiture Assets, in some markets the merged firm may retain Western's PCS wireless spectrum. Western's PCS spectrum is used primarily to provide roaming services to other providers who use GSM technology. ALLTEL does not currently provide GSM roaming and therefore the proposed acquisition will not lessen competition in providing these services. In requiring divestitures, plaintiff seeks to make certain that the potential buyer acquires all the assets it may need to be a viable competitor and replace the competition lost by the merger. The 25 MHz of cellular spectrum that must be divested will support the operation and expansion of the mobile wireless telecommunications services businesses being divested, allowing the buyer to be a viable competitor to the merged entity.

The Final Judgment requires that the Wireless Business Divestiture Assets in the Nebraska RSAs be divested to a single acquirer who, as a result, will be able to supply service to customers that require wireless telecommunications service throughout eastern and central rural Nebraska in

12

the same way that Western Wireless is currently able to provide that service. This provision resolves concerns about the loss of competition for customers that demand coverage over a combination of Nebraska FCC licensing areas, in addition to the concerns due to eliminating competition within each licensing area.

The Cellular One Group Assets consist of all right, title and interest in trademarks, trade names, service marks, service names, and designs for the Cellular One mark. Western Wireless owns the Cellular One Group Assets and under the terms of the Cellular One licensing agreements it has entered with other mobile wireless telecommunications services providers, it is required to promote and maintain the value of the mark. Western Wireless markets its mobile wireless telecommunications services under the Cellular One mark in the sixteen (16) geographic markets of concern in the Complaint. As a result of the proposed transaction, ALLTEL would have acquired the Cellular One Group Assets. ALLTEL has no need to use the Cellular One mark in the United States as it has its own established name. The buyer of the Wireless Business Divestiture Assets, on the other hand, may need to use the Cellular One name, short term or long term, in order to provide continuity for existing customers or attract new business.

When agreeing to divestitures to remedy the loss of competition as a result of a merger, the plaintiff seeks to make certain that the potential buyer acquires or has access to all assets that it may need to be a viable and substantial competitor. Having an established name is an important asset that can impact the ability of the buyer to quickly come into a market and attract customers. In order to ensure that the buyer has unimpaired access to the Cellular One mark and that the mark is in the hands of an owner who will aggressively act to promote and preserve it, the proposed Final Judgment requires ALLTEL to divest the Cellular One Group Assets. Under the terms of the

13

proposed Final Judgment, defendants will sell these assets to an appropriate purchaser who has the

intent and capability to maintain the value of the Cellular One service mark.

### A. Timing of Divestitures

In antitrust cases involving mergers or joint ventures in which plaintiff seeks a divestiture

remedy, it requires completion of the divestitures within the shortest time period reasonable under

the circumstances. The proposed Final Judgment in this case requires, in Section IV.A, divestiture

of the Divestiture Assets, within one hundred twenty (120) days after the filing of the Complaint, or

five (5) days after notice of the entry of the Final Judgment by the Court, whichever is later.

Plaintiff in its sole discretion may extend the date for divestiture of the Divestiture Assets by up to

sixty (60) days. Because the FCC's approval is required for the transfer of the wireless licenses to a

purchaser, Section IV.A provides that if applications for transfer of a wireless license have been

filed with the FCC, but the FCC has not acted dispositively before the end of the required

divestiture period, the period for divestiture of those assets shall be extended until five (5) days after

the FCC has acted. This extension is to be applied only to the individual Divestiture Assets affected

by the delay in approval of the license transfer and does not entitle defendants to delay the

divestiture of any other Divestiture Assets for which license transfer approval has been granted.

The divestiture timing provisions of the proposed Final Judgment will ensure that the

divestitures are carried out in a timely manner, and at the same time will permit defendants an

adequate opportunity to accomplish the divestitures through a fair and orderly process. Even if all

Divestiture Assets have not been divested upon consummation of the transaction, there should be no

adverse impact on competition given the limited duration of the period of common ownership and

the detailed requirements of the Preservation of Assets Stipulation and Order.

14

### B. Use of a Management Trustee

The Preservation of Assets Stipulation and Order, filed simultaneously with this Competitive Impact Statement, ensures that, prior to divestiture, the Divestiture Assets are maintained, the Wireless Business Divestiture Assets remain an ongoing business concern, and the Cellular One Group Divestiture Assets remain economically viable. The Divestiture Assets will remain preserved, independent and uninfluenced by defendants, so that competition is maintained during the pendency of the ordered divestiture.

The Preservation of Assets Stipulation and Order appoints a management trustee selected by plaintiff to oversee the Divestiture Assets in the relevant geographic markets. The appointment of a management trustee in this unique situation is required because the Wireless Business Divestiture Assets are not independent facilities that can be held separate and operated as standalone units by the merged firm. Rather, the Wireless Business Divestiture Assets are an integral part of a larger network, and to maintain their competitive viability and economic value, they should remain part of that network during the divestiture period. To insure that these assets are preserved and supported by defendants during this period, yet run independently, a management trustee is necessary to oversee the continuing relationship between defendants and these assets. The management trustee will also preserve and ensure the viability of the Cellular One Group Assets. The management trustee will have the power to operate the Divestiture Assets in the ordinary course of business, so that they will remain preserved, independent, and uninfluenced by defendants, and so that the Wireless Business Divestiture Assets remain an ongoing and economically viable competitor to defendants and to other mobile wireless telecommunications services providers. The management trustee will preserve the confidentiality of competitively sensitive marketing, pricing, and sales information; insure

defendants' compliance with the Preservation of Assets Stipulation and Order and the proposed Final Judgment; and maximize the value of the Divestiture Assets so as to permit expeditious divestiture in a manner consistent with the proposed Final Judgment.

The Preservation of Assets Stipulation and Order provides that defendants will pay all costs and expenses of the management trustee, including the cost of consultants, accountants, attorneys, and other representatives and assistants hired by the management trustee as are reasonably necessary to carry out his or her duties and responsibilities. After his or her appointment becomes effective, the management trustee will file monthly reports with plaintiffs setting forth the efforts to accomplish the goals of the Preservation of Assets Stipulation and Order and the proposed Final Judgment and the extent to which defendants are fulfilling their responsibilities. Finally, the management trustee may become the divestiture trustee, pursuant to the provisions of Section V of the proposed Final Judgment.

### C. Use of a Divestiture Trustee

In the event that defendants do not accomplish the divestiture within the periods prescribed in the proposed Final Judgment, the Final Judgment provides that the Court will appoint a trustee selected by plaintiff to effect the divestitures. As part of this divestiture, defendants must relinquish any direct or indirect financial ownership interests and any direct or indirect role in management or participation in control. Pursuant to Section V of the proposed Final Judgment, the divestiture trustee will own and control the Divestiture Assets until they are sold to a final purchaser, subject to safeguards to prevent defendants from influencing their operation.

Section V details the requirements for the establishment of the divestiture trust, the selection and compensation of the divestiture trustee, the responsibilities of the divestiture trustee in connection

16

with the divestiture and operation of the Divestiture Assets, and the termination of the divestiture trust. The divestiture trustee will have the obligation and the sole responsibility, under Section V.D, for the divestiture of any transferred Divestiture Assets. The divestiture trustee has the authority to accomplish divestitures at the earliest possible time and "at such price and on such terms as are then obtainable upon reasonable effort by the Divestiture Trustee."  In addition, to insure that the divestiture trustee can promptly locate and divest to an acceptable purchaser, plaintiff, in its sole discretion, may require defendants to include additional assets, or allow defendants to substitute substantially similar assets, which substantially relate to the Divestiture Assets to be divested by the divestiture trustee.

The divestiture trustee will not only have responsibility for sale of the Divestiture Assets, but will also be the authorized holder of the wireless licenses, with full responsibility for the operations, marketing, and sales of the wireless businesses to be divested, and will not be subject to any control or direction by defendants. Defendants will no longer have any role in the ownership, operation, or management of the Divestiture Assets following consummation of the transaction, as provided by Section V, other than the right to receive the proceeds of the sale, and certain obligations to provide support to the Divestiture Assets, and cooperate with the divestiture trustee in order to complete the divestiture, as indicated in Section V.L and in the Preservation of Assets Stipulation and Order.

The proposed Final Judgment provides that defendants will pay all costs and expenses of the divestiture trustee. The divestiture trustee's commission will be structured, under Section V.G of the proposed Final Judgment, so as to provide an incentive for the divestiture trustee based on the price obtained and the speed with which the divestitures are accomplished. After his or her appointment becomes effective, the divestiture trustee will file monthly reports with the Court and plaintiff setting

17

forth his or her efforts to accomplish the divestitures. Section V.J requires the divestiture trustee to divest the Divestiture Assets to an acceptable purchaser or purchasers no later than six (6) months after the assets are transferred to the divestiture trustee. At the end of six (6) months, if all divestitures have not been accomplished, the trustee and plaintiff will make recommendations to the Court, which shall enter such orders as appropriate in order to carry out the purpose of the trust, including extending the trust or term of the trustee's appointment.

The divestiture provisions of the proposed Final Judgment will eliminate the anticompetitive effects of the transaction in the provision of mobile wireless telecommunications services. The divestitures of the Divestiture Assets will preserve competition in mobile wireless telecommunications services by maintaining an independent and economically viable competitor in the relevant geographic markets.

## IV.  Remedies Available to Potential Private Litigants

Section 4 of the Clayton Act, 15 U.S.C. § 15, provides that any person who has been injured as a result of conduct prohibited by the antitrust laws may bring suit in federal court to recover three times the damages the person has suffered, as well as costs and reasonable attorneys' fees. Entry of the proposed Final Judgment will neither impair nor assist the bringing of any private antitrust damage action. Under the provisions of Section 5(a) of the Clayton Act, 15 U.S.C. § 16(a), the proposed Final Judgment has no prima facie effect in any subsequent private lawsuit that may be brought against defendants.

## V.  Procedures Available for Modification of the Proposed Final Judgment

Plaintiff and defendants have stipulated that the proposed Final Judgment may be entered by the Court after compliance with the provisions of the APPA, provided that plaintiff has not withdrawn

its consent. The APPA conditions entry upon the Court's determination that the proposed Final Judgment is in the public interest.

The APPA provides a period of at least sixty (60) days preceding the effective date of the proposed Final Judgment within which any person may submit to plaintiff written comments regarding the proposed Final Judgment. Any person who wishes to comment should do so within sixty (60) days of the date of publication of this Competitive Impact Statement in the Federal Register. All comments received during this period will be considered by the Department of Justice, which remains free to withdraw its consent to the proposed Final Judgment at any time prior to the Court's entry of judgment. The comments and the response of plaintiff will be filed with the Court and published in the Federal Register.

Written comments should be submitted to:

>Nancy M. Goodman
>Chief, Telecommunications and Media Enforcement Section
>Antitrust Division, U.S. Department of Justice
>1401 H Street, N.W., Suite 8000
>Washington, DC 20530

The proposed Final Judgment provides that the Court retains jurisdiction over this action, and the parties may apply to the Court for any order necessary or appropriate for the modification, interpretation, or enforcement of the Final Judgment.

## VI. Alternatives to the Proposed Final Judgment

Plaintiff considered, as an alternative to the proposed Final Judgment, a full trial on the merits against defendants. Plaintiff could have continued the litigation and sought preliminary and permanent injunctions against ALLTEL's acquisition of Western Wireless. Plaintiff is satisfied, however, that the divestiture of assets and other relief described in the proposed Final Judgment will

19

preserve competition for the provision of mobile wireless telecommunications services in the relevant markets identified in the Complaint.

### VII. Standard of Review Under the APPA for the Proposed Final Judgment

The APPA requires that proposed consent judgments in antitrust cases brought by the United States be subject to a sixty (60) day comment period, after which the Court shall determine whether entry of the proposed Final Judgment "is in the public interest." 15 U.S.C. § 16(e)(1). In making that determination, the Court shall consider:

(A)    the competitive impact of such judgment, including termination of alleged violations, provisions for enforcement and modification, duration or relief sought, anticipated effects of alternative remedies actually considered, whether its terms are ambiguous, and any other competitive considerations bearing upon the adequacy of such judgment that the court deems necessary to a determination of whether the consent judgment is in the public interest; and

(B)    the impact of entry of such judgment upon competition in the relevant market or markets, upon the public generally and individuals alleging specific injury from the violations set forth in the complaint including consideration of the public benefit, if any, to be derived from a determination of the issues at trial.

15 U.S.C. § 16(e)(1)(A) & (B). As the United States Court of Appeals for the District of Columbia Circuit has held, the APPA permits a court to consider, among other things, the relationship between the remedy secured and the specific allegations set forth in the government's complaint, whether the consent judgment is sufficiently clear, whether enforcement mechanisms are sufficient, and whether the consent judgment may positively harm third parties. *See United States v. Microsoft Corp.*, 56 F.3d 1448, 1458-62 (D.C. Cir. 1995).

"Nothing in this section shall be construed to require the court to conduct an evidentiary hearing or to require the court to permit anyone to intervene." 15 U.S.C. § 16(e)(2). Thus, in conducting this inquiry, "[t]he court is nowhere compelled to go to trial or to engage in extended

proceedings which might have the effect of vitiating the benefits of prompt and less costly settlement

through the consent decree process." 119 Cong. Rec. 24,598 (1973) (statement of Senator Tunney).[1]

Rather:

> [a]bsent a showing of corrupt failure of the government to discharge its duty, the Court, in
> making its public interest finding, should . . . carefully consider the explanations of the
> government in the competitive impact statement and its responses to comments in order to
> determine whether those explanations are reasonable under the circumstances.

*United States v. Mid-America Dairymen, Inc.*, 1977-1 Trade Cas. (CCH) ¶ 61,508, at 71,980 (W.D.

Mo. 1977).

Accordingly, with respect to the adequacy of the relief secured by the proposed Final

Judgment, a court may not "engage in an unrestricted evaluation of what relief would best serve the

public." *United States v. BNS Inc.*, 858 F.2d 456, 462 (9th Cir. 1988) (citing *United States v. Bechtel

Corp.*, 648 F.2d 660, 666 (9th Cir. 1981)); *see also Microsoft*, 56 F.3d at 1460-62. Courts have held

that:

> [t]he balancing of competing social and political interests affected by a proposed antitrust
> consent decree must be left, in the first instance, to the discretion of the Attorney General.
> The court's role in protecting the public interest is one of insuring that the government has not
> breached its duty to the public in consenting to the decree. The court is required to determine
> not whether a particular decree is the one that will best serve society, but whether the

---

[1]      *See United States v. Gillette Co.*, 406 F. Supp. 713, 716 (D. Mass. 1975)
(recognizing it was not the court's duty to settle; rather, the court must only answer "whether the
settlement achieved [was] within the reaches of the public interest"). A "public interest"
determination can be made properly on the basis of the Competitive Impact Statement and
Response to Comments filed by the Department of Justice pursuant to the APPA. Although the
APPA authorizes the use of additional procedures, 15 U.S.C. § 16(f), those procedures are
discretionary. A court need not invoke any of them unless it believes that the comments have
raised significant issues and that further proceedings would aid the court in resolving those
issues. *See* H.R. Rep. No. 93-1463, 93d Cong., 2d Sess. 8-9 (1974), *reprinted* in 1974
U.S.C.C.A.N. 6535, 6538-39.

settlement is "*within the reaches of the public interest.*" More elaborate requirements might undermine the effectiveness of antitrust enforcement by consent decree.

*Bechtel*, 648 F.2d at 666 (emphasis added) (citations omitted).[2]

The proposed Final Judgment, therefore, should not be reviewed under a standard of whether it is certain to eliminate every anticompetitive effect of a particular practice or whether it mandates certainty of free competition in the future. Court approval of a final judgment requires a standard more flexible and less strict than the standard required for a finding of liability. "[A] proposed decree must be approved even if it falls short of the remedy the court would impose on its own, as long as it falls within the range of acceptability or is 'within the reaches of public interest.'" *United States v. AT&T Corp.*, 552 F. Supp. 131, 151 (D.D.C. 1982) (citations omitted) (quoting *Gillette*, 406 F. Supp. at 716), *aff'd sub nom. Maryland v. United States*, 460 U.S. 1001 (1983); *see also United States v. Alcan Aluminum Ltd.*, 605 F. Supp. 619, 622 (W.D. Ky. 1985) (approving the consent judgment even though the court would have imposed a greater remedy).

Moreover, the Court's role under the APPA is limited to reviewing the remedy in relationship to the violations that the United States has alleged in its Complaint, and does not authorize the Court to "construct [its] own hypothetical case and then evaluate the decree against that case." *Microsoft*, 56 F.3d at 1459. Because the "court's authority to review the decree depends entirely on the government's exercising its prosecutorial discretion by bringing a case in the first place," it follows

---

[2]     *Cf. BNS*, 858 F.2d at 464 (holding that the court's "ultimate authority under the [APPA] is limited to approving or disapproving the consent decree"); *Gillette*, 406 F. Supp. at 716 (noting that, in this way, the court is constrained to "look at the overall picture not hypercritically, nor with a microscope, but with an artist's reducing glass"); *see generally Microsoft*, 56 F.3d at 1461 (discussing whether "the remedies [obtained in the decree are] so inconsonant with the allegations charged as to fall outside of the 'reaches of the public interest'").

22

that "the court is only authorized to review the decree itself," and not to "effectively redraft the complaint" to inquire into other matters that the United States did not pursue. *Id.* at 1459-60.

### VIII.  Determinative Documents

There are no determinative materials or documents within the meaning of the APPA that were considered by plaintiff United States in formulating the proposed Final Judgment.


Dated: July 6, 2005

Respectfully submitted,

Deborah A. Roy (D.C. Bar # 452573)
Laura R. Starling
Hillary B. Burchuk (D.C. Bar # 366755)
Matthew C. Hammond
Attorneys, Telecommunications & Media
Enforcement Section
Antitrust Division

U.S. Department of Justice
City Center Building
1401 H Street, N.W., Suite 8000
Washington, D.C.  20530
(202) 514-5621
Facsimile: (202) 514-6381